IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| BILLY GENE COGDILL, ) | C.A. No. 3:08-03466-CMC |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | **OPINION AND ORDER** |
| ) | **ON CROSS MOTIONS FOR** |
| AMERICAN GENERAL ASSURANCE ) | **SUMMARY JUDGMENT** |
| COMPANY, ) | |
| ) | |
| ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

Through this action, Billy Gene Cogdill ("Cogdill") seeks recovery for alleged bad faith failure to pay an accidental death claim filed as a result of the death of his wife, Nan Watson Cogdill ("Decedent") under an insurance policy issued by American General Assurance Company ("American General"). The matter is now before the court on cross motions for summary judgment. For the reasons stated below, Cogdill's motion is **denied** and American General's motion is **granted**.

**STANDARD**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine

issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The nonmoving party must then designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also generally Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

## **BACKGROUND**[1]

It is undisputed that at the time of her death, Decedent was insured under a group Accidental Death and Dismemberment insurance policy, group policy no. G5000017, certificate number 975-0600271 ("Policy"), issued by American General. Dkt. No. 1-2 at 5; Dkt. No. 26-1 at 2. Under the Policy, benefits are payable for losses suffered "solely as a result of an accidental bodily injury." Dkt. No. 26-1 at 6. The coverage is, however, subject to various "Exclusions and Limitations," including the following:

> No benefits will be paid for any loss that results from or is caused directly, indirectly, wholly or partly by any of the following: . . . 3. a physical or mental sickness, or treatment of that sickness; 4. voluntary intake of . . . drugs . . . , unless taken as prescribed by a doctor; . . . 6. being intoxicated or under the influence of any drug, unless taken as prescribed by a doctor[.]

*Id.*

---

[1] Because the court concludes that Defendant American General is entitled to summary judgment, it presents the facts here in the light most favorable to Plaintiff Cogdill. The facts critical to this motion are, however, generally undisputed.

2

Decedent died on February 14, 2008. Dkt. No. 26-2 at 2 (death certificate). Dr. Kitt R. McMaster, M.D. ("Dr. McMaster")[2] performed an autopsy and concluded that the manner of death was accidental. Dkt. No. 26-2 at 2; Dkt. No. 26-3 at 2 (autopsy report). Neither party disputes this classification. More specifically, Dr. McMaster concluded that the cause of Decedent's death was "Multiple Medicinal Drug Overdosage." Dkt. No. 26-3 at 2. According to the Autopsy Report, "[t]he death [was] most likely related to the presence of multiple medicinal compounds." *Id.* at 5.

A blood toxicologic report detailed in the Autopsy Report noted a combination of numerous drugs in Decedent's system, including temazepam, alprazolam (also known as Xanax),[3] oxycodone,[4] normeperidine, quetiapine, and promethazine. *Id.* at 4-5. Oxycodone was found in the "toxic, but not lethal, range"[5] and alprazolam was reported "to be at high therapeutic levels, just below [the] 'potentially toxic' range."[6] *Id.* at 5. The remaining drugs were in the therapeutic range.

---

[2] Cogdill identified Dr. McMaster as Plaintiff's expert witness in a document filed April 9, 2009. Dkt. No. 20. American General has not designated an expert witness but, nonetheless, appears to rely on the testimony of Dr. McMaster.

[3] The drug toxicologic report lists this drug as both alprazolam and Xanax, one of its brand names. Decedent had been prescribed Xanax for depression and anxiety. Dkt. No. 26-3 at 3. Therefore, the court uses the brand name Xanax when discussing this drug.

[4] The drug toxicologic report lists this drug as both oxycodone and OxyContin, one of its brand names. However, Dr. McMaster testified that he did not know which brand of oxycodone Decedent ingested. Dkt. No. 26-4 at 21. Therefore, the court uses the generic name oxycodone when discussing this drug.

[5] Dr. McMaster provided two different scales for classifying the level of a drug reported by the blood toxicologic report (as either therapeutic, toxic, or lethal), one provided by the lab conducting the test (NMS Labs) and another called the Winek scale. Because the NMS Labs' scale only provided a range for the therapeutic level of oxycodone, Dr. McMaster relied on the Winek scale in reaching his conclusion that "[o]xycodone is in toxic, but not lethal, range." Dkt. No. 26-3 at 5.

[6] Both the NMS Labs' scale and the Winek scale provided therapeutic and toxic ranges for Xanax. *Id.* at 4. The concentration of Xanax in Decedent's blood was classified as therapeutic

Of the various drugs found in Decedent's blood, the Autopsy Report notes evidence that she had a prescription for Xanax (alprazolam), temazepam, and Mepergan Fortis (made up of meperidine and promethazine). Dkt. No. 26-3 at 3. Decedent also had a prescription for Prozac, although this drug was not listed in the drug toxicologic report. *Id.* at 3-5. No other evidence has been presented as to the medications prescribed for Decedent's use or the prescribed dosages.[7]

As to the manner of Decedent's death, Dr. McMaster reached the following conclusion:

> While none of these drugs were present at clearly lethal levels, the potentially toxic effects of their combination and interaction are considered to be sufficient to explain demise. In view of the fact that there were no drug lethal levels, in conjunction with the absence of positive indicators of suicidal intent, the *manner of death* is being classified as *accidental*.

*Id.* (emphasis in original).

In April of 2008,[8] Cogdill submitted an accidental death claim ("Claim") to American General under the Policy. Dkt. No. 1-2 ¶ 6; Dkt. No. 4 at 2. In a June 28, 2008 letter, American General acknowledged receipt of the Claim and informed Cogdill that it would contact him regarding its payment decision. Dkt. No. 1-2 ¶ 7. Cogdill contends that he continued contacting

---

based on the Winek scale and high therapeutic, just below potentially toxic, on the NMS Labs' scale. Dr. McMaster relied on the NMS Labs' scale instead because he generally preferred using the scale provided by the lab that conducted the test. Dkt. No. 26-4 at 13.

[7] In its memorandum in support of summary judgment, American General refers to Dr. McMaster's deposition testimony as including the statement that "no physician would prescribe all of these medications for – for one person." Dkt. No. 26 at 5 (citing Dr. McMaster's Dep. at 48). The court declines to rely on this statement given American General's failure to file the relevant excerpt. The court notes, nonetheless, that Cogdill has not challenged the accuracy of this reference to Dr. McMaster's deposition testimony.

[8] Cogdill alleges that the Claim was submitted on April 10, 2008. Dkt. No. 1-2 ¶ 6. American General answers that the Claim was submitted by a letter dated April 14, 2008. Dkt. No. 4 ¶ 6. This slight difference in the factual allegations is of no particular significance to the present motions.

American General in an attempt to collect benefits under the Policy but received no response. *Id.*

Cogdill filed a Summons and Complaint in the Richland County Court of Common Pleas on September 10, 2008, alleging breach of insurance contract and unreasonable refusal to pay benefits. Dkt. No. 1-2. American General timely removed the matter to this court on October 13, 2008, relying on the court's diversity jurisdiction. Dkt. No. 1.[9]

**DISCUSSION**

"Insurers have the right to limit their liability provided they do not contravene a statutory provision or public policy." *Burns v. State Farm Mut. Auto. Ins. Co.*, 377 S.E.2d 569 (S.C. 1989) (citing *Pa. Nat'l Mut. Cas. Ins. v. Parker*, 320 S.E.2d 458 (S.C. Ct. App. 1984)). However, "[e]xclusions in an insurance policy are always construed most strongly against the insurer." *Boggs v. Aetna Cas. & Sur. Co.,* 252 S.E.2d 565, 568 (S.C. 1979) (citing *Preferred Risk Mut. Ins. Co. v. Thomas*, 372 F.2d 227 (4th Cir. 1967)).

If any individual exclusion in an insurance policy bars a claim, it will operate to preclude the recovery of benefits by the insured regardless of the contents of any other exclusions. *See Engineered Prods., Inc. v. Aetna Cas. & Sur. Co.*, 368 S.E.2d 674, 675 (S.C. Ct. App. 1988) ("Exclusions in an insurance contract are to be read independently of each other; they are not to be read cumulatively. . . . 'If any one exclusion applies there should be no coverage[.]'" (quoting *Weedo v. Stone-E-Brick, Inc.*, 405 A.2d 788 (N.J. 1979)).

For purposes of summary judgment, the parties agree that Decedent's death was accidental,

---

[9] The Policy is a group policy, but there is no indication or allegation that it is within the category of group policies governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*

5

and, therefore, falls within the general coverage of the Policy. Whether American General should have paid the Claim, therefore, depends on whether the Claim falls within a Policy exclusion. American General argues that exclusions 3, 4, and 6 bar Cogdill's Claim. Cogdill asserts that none of these exclusions applies and thus that American General violated the terms of the Policy by failing to pay the Claim. Because coverage turns on the application of an exclusion, American General bears the burden of proof. *See Owners Ins. Co. v. Clayton*, 614 S.E.2d 611, 614 (S.C. 2005) (citing *Boggs v. Aetna Cas. & Sur. Co.,* 252 S.E.2d 565 (S.C. 1979)) ("Insurance policy exclusions are construed most strongly against the insurance company, which also bears the burden of establishing the exclusion's applicability.").

## I. Exclusions 4 and 6

American General argues that exclusions 4 and 6 bar recovery. The court considers these exclusions together because they turn on the same central facts.

Exclusion 4 precludes the payment of benefits where the claimed loss results from or is caused by the "voluntary intake of . . . drugs . . . , *unless taken as prescribed by a doctor*." Dkt. No. 26-1 at 6 (emphasis added). Exclusion 6 of the Policy precludes the payment of benefits where the claimed loss results from or is caused by "being intoxicated or under the influence of any drug, *unless taken as prescribed by a doctor*." Dkt. No. 26-1 at 6 (emphasis added). It is only the second part of both exclusions which is in dispute.[10]

The key issue for determining if exclusion 4 or 6 prevents Cogdill from receiving benefits

---

[10] Dr. McMaster testified that based on his examination of Decedent's body and a review of the circumstances surrounding her death, he assumed that Decedent took the pills which caused her death "voluntarily." Dkt. No. 26-4 at 28. Dr. McMaster also testified that in his professional opinion the cause of Decedent's death was "[c]ombined drug intoxication." Dkt. No. 26-4 at 18. No evidence or argument has been presented challenging either conclusion.

6

for Decedent's death is, therefore, whether Decedent took the drugs "as prescribed by a doctor." American General argues that it is entitled to judgment as a matter of law that Decedent's ingestion of oxycodone was not "as prescribed by a doctor," particularly when considered in combination with her ingestion of numerous other drugs. As to oxycodone, American General relies both on the absence of evidence that Decedent had any prescription for this drug and on the fact that Decedent's blood levels of this drug reflect ingestion of a dosage greater than a doctor would have prescribed. American General also notes the high level of Xanax in Decedent's blood and Dr. McMaster's (apparent) testimony that no doctor would have prescribed all of the drugs found in Decedent's system. *See supra* note 7.

For the reasons set forth below, the court agrees that American General is entitled to judgment as a matter of law that coverage is excluded by exclusions 4 and 6 based on Decedent's voluntary ingestion of a toxic dose of oxycodone. While the court considers the fact that oxycodone was taken in addition to other drugs with which it combined to cause Decedent's death, the court assumes for present purposes that each of those drugs, including Xanax, was taken "as prescribed by a doctor." The court also assumes, without deciding, that Decedent held a valid prescription for oxycodone.

**Meaning of "as prescribed by a doctor."** The Policy does not provide a definition for the term "as prescribed by a doctor." In the absence of a definition in the Policy, the court applies basic principles of contract interpretation to determine the meaning of policy language. *Fritz-Pontiac-Cadillac-Buick v. Goforth*, 440 S.E.2d 367, 369 (S.C. 1994) (citing *Sloan Constr. Co. v. Cent. Nat'l Ins. Co.*, 236 S.E.2d 818 (S.C. 1977)) ("Insurance policies are subject to general rules of contract construction."). Under basic contract interpretation principles, undefined policy

7

language should be given "its plain, ordinary, and popular meaning." *Id*.

Cogdill contends that the "usual understanding of 'as prescribed by a doctor' to the ordinary person in the context of the policy would simply mean using drugs that have been prescribed to the insured by a medical doctor." Dkt. No. 27-1 at 5 (Mem. in Supp. of Pl.'s Mot. for Summ. J.). Alternatively, Cogdill argues that the language is ambiguous because it "could either mean taking medication that has been prescribed by a doctor or taking medication in the amount which has been prescribed." *Id.* at 7. Cogdill is correct that "[w]here the words of an insurance contract policy are capable of two reasonable interpretations, that construction will be adopted which is most favorable to the insured." *Forner v. Butler*, 460 S.E.2d 425 (S.C. Ct. App. 1995). Nonetheless, the court finds Cogdill's proposed interpretation to be an unreasonable interpretation of the critical phrase.

The plain, ordinary, and popular understanding of the phrase "as prescribed by a doctor" entails more than merely taking a medicine for which an individual has a doctor's prescription. Instead, the plain meaning of this phrase requires taking the drugs *in accordance with* the prescribing doctor's specific instructions.[11] One such instruction, and perhaps the most important, is the dosage at which the drug is to be taken.

Other courts have adopted similar interpretations of this language in accidental death insurance policies. For example, a district court in Nevada concluded that this language required "following *all prescribing instructions* associated with [the] prescriptions" and "exact adherence to instructed dosages." *Hummel v. Cont'l Cas. Ins. Co.*, 254 F. Supp. 2d 1183, 1188, 1190 (D. Nev. 2003) (emphasis added). Similarly, in *Ortega v. Aetna Life Ins. Co.*, a district court in Texas granted

---

[11] The inclusion of the word "as" in the phrase "as prescribed by a doctor" suggests something more than the mere fact that a prescription was issued. The latter meaning would be better conveyed by the shorter phrase "prescribed by a doctor."

8

summary judgment for the insurer where the accidental death policy contained an exclusion for death caused by drugs unless taken "as prescribed by a physician," and the court determined that there was sufficient evidence for the insurer's claims administrator to conclude that decedent's death occurred as a result of taking methadone in excess of her doctor's prescription and estazolam without a doctor's prescription. 2007 WL 1125782 (S.D. Tex. 2007). While ultimately determining that language from a statutory provision preempted the policy language, a district court in California, likewise, noted that if the policy's "as prescribed by a physician" language had applied, it would "exclude coverage *if the insured exceeded the prescribed dose* and was injured as a result." *Smith v. Stonebridge Life Ins. Co.*, 582 F. Supp. 2d 1209, 1220 (N.D. Cal. 2008) (emphasis added).

The court, therefore, concludes that the Policy language, "as prescribed by a doctor" requires adherence to all instructions provided by the doctor, including the dosage level. In this regard, the court finds no ambiguity in the meaning of this policy language and rejects the interpretation which Cogdill advances.

**Language Applied.** As discussed above, the level of oxycodone in Decedent's blood was in the toxic but not lethal range. She also had numerous other drugs in her system, although, for present purposes, the court assumes that all of these drugs, including Xanax, were within the therapeutic range. *See supra* note 6 (noting that, depending on the scale used, the concentration of Xanax in Decedent's blood was either in the toxic or high therapeutic range).

The court also assumes, without deciding, that Decedent was prescribed oxycodone by a doctor.[12] However, even after assuming that Decedent had been prescribed all of the drugs found

---

[12] American General has presented limited evidence as to whether Decedent held a prescription for oxycodone. It relies on statements by Dr. McMaster that he was not made aware of any such prescription. Dr. McMaster also indicated in the Autopsy Report that his review of

9

in her system, the court finds that a jury could not reasonably conclude that Decedent took oxycodone "as prescribed by a doctor."

In reaching this conclusion, the court considers the uncontroverted evidence that Decedent ingested a toxic amount of oxycodone before her death. *See* Dkt. No. 26-3 at 5 (summary of toxicologic studies in Autopsy Report concluding that oxycodone was in a "toxic, but not lethal, range"). The court also considers Dr. McMaster's testimony that he would not expect to find a quantity of a drug in excess of the therapeutic range in an individual's blood if that individual took the drug as prescribed by a doctor. Dkt. No. 26-4 at 13; s*ee also* Dkt. No. 26-4 at 14-15, 18, 20 (Dr. McMaster's testimony agreeing that the amount of oxycodone found in Decedent's system was in excess of what a doctor would prescribe for someone needing that medicine). Finally, the court considers the absence of any contrary evidence. For example, there is no evidence of a contrary expert opinion. Indeed, the *only* expert identified is Dr. McMaster, and he was identified by Cogdill. Dkt. No. 20 (Pl.'s Expert Disclosures). There is, likewise, no medical or prescription history presented which might show that this toxic dosage of oxycodone was, in fact, consistent with a doctor's instructions.

Under these circumstances, the court concludes that any reasonable jury would be compelled

---

Lexington Medical Center records disclosed a statement by Decedent's daughter that her mother shopped doctors to get prescriptions for Xanax and mepergan. Such an absence of evidence may support a finding that Decedent held no such prescription, at least if one assumes that Cogdill would have had access to Decedent's prescription information and failed to provide it to American General despite a request for the same. There is, however, no evidence that American General made such a request, either prior to litigation or in the course of discovery. Neither is there any evidence offered regarding Cogdill's ability to access Decedent's prescription history. Under these circumstances, the court finds that American General has failed to meet its burden of proof on this aspect of exclusions 4 and 6. On the other hand, for the reasons stated below, American General has met its burden of establishing that even if she held a prescription for oxycodone, Decedent did not take oxycodone as prescribed.

to conclude that Decedent took an amount of oxycodone in excess of what a doctor would have prescribed, even assuming she had a prescription for this medication. Any other conclusion could only be based on speculation.

**Causal Connection**. This does not, however, end the inquiry. "An insurer must [also] show a causal connection between a loss and an exclusion before the exclusion will limit coverage under the policy." *S.C. Guar. Ass'n v. Broach*, 353 S.E.2d 450, 451 (S.C. 1987). American General has proffered uncontroverted evidence that Decedent's death was the combined result of the multiple drugs in her system, including the toxic level of oxycodone. American General points to the cause of death determinations in Decedent's official death certificate ("multiple medicinal drug overdose"), Dkt. No. 26-2 at 2, the Autopsy Report ("Multiple Medicinal Drug Overdosage"), Dkt. No. 26-3 at 2, and Dr. McMaster's deposition testimony ("[c]ombined drug intoxication"), Dkt. No. 26-4 at 18 to support this proposition. This evidence leaves no genuine issue of material fact as to the cause of death, including the significant impact of Decedent's ingestion of oxycodone, particularly in combination with the other medications. As discussed in detail above, American General has also established that the oxycodone was not "taken as prescribed by a doctor." Therefore, the court finds that American General has established a causal connection between Decedent's death and exclusions 4 and 6 as a matter of law.

## II. Exclusion 3

Because the court finds no genuine issue of material fact as to the propriety of American General's denial of Cogdill's Claim based on exclusions 4 and 6 of the Policy, it does not reach the issue of whether coverage could have also been denied based on exclusion 3.

## CONCLUSION

11

For the reasons set forth above, the court concludes that Defendant American General is entitled to judgment as a matter of law that Decedent's death is excluded from coverage under both exclusions 4 and 6 of the Policy. Accordingly, Plaintiff Billy Gene Cogdill's motion for summary judgment is **denied** and Defendant American General Assurance Company's motion for summary judgment is **granted**.

IT IS SO ORDERED.

    s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
October 8, 2009